**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0597n.06**

**No. 08-1931**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
Aug 24, 2009
LEONARD GREEN, Clerk**

| | | |
|---|---|---|
| **JAMES CULP,** *et al.* | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiffs-Appellants*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **SHANTELL RUTLEDGE,** *et al.*, | ) | **O P I N I O N** |
| | ) | |
| *Defendants-Appellees*. | ) | |

BEFORE:    KEITH, COLE, and WHITE, Circuit Judges.

COLE, Circuit Judge.  This case arises out of the February 26, 2006 shooting by Kevin Collins at the Zion Hope Missionary Baptist Church ("Zion Church").  The shooting resulted in the death of Rosetta Williams, the mother of Collins's ex-girlfriend, Jamika Williams ("Jamika"), and severely injured Toi Edwards.  Plaintiffs-Appellants, James Culp, the husband and personal representative of the estate of Rosetta; Marquetta Hill, next friend and legal guardian of Edwards, a minor; Leeyang Williams ("Leeyang"), individually and as next friend and legal guardian of Tanei Jerry and Teiagh Williams, minors; Betty Williams; Ieshia Dawson; and Tieshia Dawson (collectively, "Plaintiffs"), brought suit under 42 U.S.C. § 1983 against Defendants City of Detroit, Detroit Police Chief, Ella Bully-Cummings, and five individual Detroit police officers, alleging violations of their due process rights on a "state-created danger" theory.  Plaintiffs now appeal the district court's July 7, 2008 order granting summary judgment to Defendant-Appellee, Detroit Police Sergeant Durelle Cooper ("Sergeant Cooper"), in her individual and official capacity.  For the

08-1931, *Culp, et al v. Rutledge, et al.*

following reasons, this Court **AFFIRMS** the district court's decision granting summary judgment to Sergeant Cooper.

## I. BACKGROUND

**A.     Factual background**

Jamika, a resident of Detroit, and Collins, a resident of Minnesota, met through a mutual friend in 2004, and the two began a long-distance relationship—Collins lived in Minnesota, and Jamika lived in Detroit.  In May 2005, the couple had a child, Anijah Collins, who lived in Detroit with Jamika and her parents, Rosetta and Culp.  Jamika and Collins saw each other every few months, but Jamika ended the relationship in 2005 when Collins tried to choke her during one of her visits to see him in Minnesota.  Following the couple's break-up, Collins moved to Detroit, but Jamika and Collins had no contact until the following February 1, 2006 incident occurred.

*1.     Collins's February 1, 2006 attack on Jamika*

At approximately 7:30 p.m. on February 1, 2006, Collins confronted Jamika at the Zion Hope Missionary Baptist Church ("Zion Church") where Jamika regularly attended bible study.  According to Jamika, Collins grabbed her while she was holding Anijah and said, "You not going to come back with me, you not going to be with me."  (Record on Appeal ("ROA") 368.)  Their argument escalated, and Collins led Jamika into Zion Church where other congregants witnessed him throw Jamika and Anijah to the ground.  Two security guards pulled Collins away from Jamika and attempted to restrain him, but Collins was able to break their hold and escape.  After Collins fled the scene, Jamika's aunt, Leeyang, and other witnesses escorted Jamika to the pastor's office.  There, someone contacted law enforcement authorities.

08-1931, *Culp, et al v. Rutledge, et al.*

Officers Shantell Rutledge and Derrick Mason responded to the call, and interviewed severl people who witnessed the attack. The officers were unable to arrest Collins for the misdemeanor offense of domestic assault because Collins had fled the scene before they arrived, and the officers were not authorized to engage in any further efforts to arrest Collins given the minor nature of the injuries sustained by Jamika. The officers did escort Jamika to Leeyang's house, and Leeyang drove Jamika home shortly thereafter. Officer Rutledge testified that on returning to the police station, she contacted the Domestic Violence Unit, where she spoke to Sergeant Cooper and advised her of the incident. Rutledge than completed and electronically filed her Crisnet[1] report of the incident, which was "verified"—typed and reviewed—and forwarded to the Northeastern District Investigation Operations Division ("IOD") by Officer Rocco Corsetti on February 2, 2006 at 9.25 p.m.

On February 1, 2006, the evening of the attack, Jamika, accompanied by her parents, drove to the Eleventh Precinct to file a formal complaint against Collins for assault and battery. Culp and Jamika entered the police station, while Rosetta remained in the car. Jamika made a detailed oral report about the assault to two unidentified officers. The officers told Jamika and Culp that given the nature of the attack, Jamika should file her report at the Fifth Precinct Domestic Violence Unit, which was located in another building.

Jamika and her parents then traveled to the Domestic Violence Unit, and Rosetta again remained in the car while Jamika and Culp entered the police station and met with an officer—an unidentified female they described as an "African[-]American woman of medium build." (ROA 378.) Jamika provided the officer with a detailed written report on a preprinted form, and the officer

---

[1]Crisnet, Inc. refers to the privately held software firm that develops record-keeping systems for law enforcement, justice, and public safety agencies.

08-1931, *Culp, et al v. Rutledge, et al.*

took Polaroid photographs of Jamika's injuries. Jamika testified that the interaction, which lasted until approximately 2:30 a.m. on February 2, occurred in an open area, where another unidentified female officer was working and an unidentified man was mopping the floor.

Sergeant Cooper was a sergeant in the Domestic Violence Unit of the Detroit Police Department from 1994 through June 2006, when she was briefly transferred to two other units, before being reassigned to Domestic Violence in June 2007. At the time of Collins's February 1, 2006 attack, Sergeant Cooper was the Domestic Violence Unit supervisor on the midnight shift. Sergeant Cooper recalled receiving a telephone call from Officers Rutledge and Mason on the evening of February 1, 2006, notifying her of Jamika's domestic violence complaint and informing her that the officers would email her the Crisnet report when it was complete. Sergeant Cooper also testified that Jamika and Culp never came to the Domestic Violence Unit to make a formal complaint against Collins during Sergeant Cooper's February 1 and February 2, 2006 shift, and that she never took a written witness statement from Jamika setting forth the details of Collins's February 1 attack. However, the district court noted that the signature on Jamika's witness statement appears to be that of Sergeant Cooper, stating: "Taking the evidence in the light most favorable to the [P]laintiffs, the signature is sufficient to establish that Cooper took Jamika Williams's statement." (ROA 795, n.3.) Jamika and Culp assert that the female officer explicitly told them that Collins would be arrested either at his apartment or his place of employment. They also claim that they did not see Collins around the neighborhood after they made the report, so they assumed that he was in jail.

Though Sergeant Cooper denies taking Jamika's statement, she testified in her deposition as to the common practices and procedures used in dealing with "not-in-custody" domestic violence cases—cases where the abuser has left the scene—such as Jamika's:

08-1931, *Culp, et al v. Rutledge, et al.*

After the police respond to a "not-in-custody" domestic violence case, they contact the Domestic Violence Unit by phone to notify the Unit of the incident. They then electronically file a Crisnet report, which is forwarded to the Unit once it is verified and processed.

Each morning, an officer in the Domestic Violence Unit gathers the Crisnet reports that were electronically filed the night before and randomly assigns them to the investigators on duty.

In "not-in-custody" domestic violence cases, a victim who wants to press charges has to come into the Domestic Violence Unit to make a written statement and fill out a two-page questionnaire. If the victim does not visit the Unit on her own accord within eight hours of the Crisnet report being filed, the investigator that was assigned her case will attempt to contact her by phone (or, if the victim has no telephone, by certified mail) to ask her to visit the Unit.

If the victim elects to visit the Domestic Violence Unit and wants to press charges, one of the officers on duty will help her to complete a written statement and ask her to fill out a two-page questionnaire. If the victim is visibly injured, the officer will also take Polaroid photographs of her injuries. The officer will then type up a "not-in-custody" warrant. The warrant, written statement, questionnaire, and photographs are attached and left for the state prosecutor's review.

Officers also typically tell the victim that she can file a personal protection order ("PPO") against the abuser, and that she has the option of talking to social workers at the Unit if she needs shelter or some other form of assistance while the warrant is being processed.

The prosecutor's signature is required to finalize the warrant, but the prosecutor must meet with the victim in person to decide whether there is sufficient evidence to support an arrest. The prosecutors typically do not work nights, so if a victim were to file a report during a night-shift, she would have to arrange a mutually convenient time to meet with the prosecutor in the following few days.

Once the prosecutor meets with the victim and elects to sign a warrant, it can take anywhere from one to two weeks to get the warrant back, at which point, the investigator assigned to the case contacts the victim to notify them that the warrant is complete and tell them the "warrant number." The Domestic Violence Unit's "arrest team" then attempts to locate and arrest the abuser.

Sergeant Cooper testified that, as was standard procedure, once the Crisnet report was filed,

Jamika's case was randomly assigned to the Domestic Violence Investigator, Alexis Lewis, who was

tasked with contacting Jamika to discuss pressing formal charges against Collins. Sergeant Cooper explained that Lewis later informed her that Jamika never visited the Domestic Violence Unit, and that Lewis was unable to contact her by phone. Sergeant Cooper testified that because Jamika never followed up on the Crisnet report, Collins was not arrested.

### 2. February 26, 2006 attack

At approximately 10:55 a.m. on February 26, 2006, Collins returned to Zion Church armed with a sawed-off shotgun and sat in the top row of the balcony. Rosetta and other members of the Williams family also sat in the balcony, but neither Jamika nor Culp was present. Witnesses testified that Collins and Rosetta engaged in a heated exchange, and Collins exposed the shotgun from underneath his coat and began to fire. Rosetta died from two gunshot wounds to her chest, and Edwards was struck in her left hand, resulting in the loss of her pinky finger. Collins escaped, and after a failed car-jacking, he died of an apparent self-inflicted gunshot wound.

Jamika later testified that Collins's brother, Denzel Collins, called her and threatened both Jamika and her family three times before the shooting, and that on February 2, 2006, she informed him that she had filed a domestic violence report against his brother. She also testified that her family was concerned that Collins might harm them as well, but that based on Jamika and Culp's interaction with Sergeant Cooper, she and her family mistakenly thought that Collins was in jail.

### B. Procedural background

On December 14, 2006, Plaintiffs filed a complaint against Defendant City of Detroit, Detroit Police Chief, Ella Bully-Cummings, Officers Rutledge, Mason, Corsetti, and Stephan Simmons, and Sergeant Cooper, alleging violations of their due process rights under 42 U.S.C. § 1983. Count I alleged claims against the City of Detroit and Bully-Cummings; Count II alleged claims against the

08-1931, *Culp, et al v. Rutledge, et al.*

remaining Defendants. Plaintiffs sought $25,000 in "compensatory, punitive, exemplary, hedonic and other available damages" as well as an award of "costs, interest, and attorney fees." (ROA 39.)

On April 14, 2008, Defendants moved for summary judgment, and following a hearing Plaintiffs orally stipulated to the dismissal of Defendants City of Detroit, Chief Bully-Cummings, and Detroit Police Officers Rutledge, Mason, Corsetti, and Simmons. Sergeant Cooper, the single remaining defendant, asserted that Plaintiffs had no standing to bring a due process claim on behalf of Rosetta and that, regardless, Plaintiffs failed to show that she had engaged in actionable affirmative conduct that had placed Plaintiffs at risk to an attack by Collins or that she had been deliberately indifferent to Williams and Edwards..

On July 7, 2008, the district court granted summary judgment to Sergeant Cooper based on its determination that Plaintiffs' record evidence did not satisfy the elements of a claim under the state-created danger exception. Plaintiffs thereupon filed the instant appeal.

## II. ANALYSIS

### A. Standard of review

We review the district court's grant of summary judgment as to Plaintiffs' substantive claims de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009); *see also Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B.      The state-created danger exception

42 U.S.C. § 1983 provides a federal cause of action for civil damages against an individual acting under color of state law who deprives another of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Plaintiffs argue that Sergeant Cooper violated the substantive due process guarantees of the Fourteenth Amendment when she failed to protect Jamika and her family from the likely danger posed by Collins.

The Supreme Court has held that the Due Process Clause generally does not provide individuals with an affirmative right to state protection. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 198 (1989). In *DeShaney*, the Court addressed a claim brought by a mother and her child under 42 U.S.C. § 1983 against the county department of social services, alleging that the child had been denied due process of law when the department failed to intervene to protect him from the injuries he suffered at the hands of his violent father. *See id.* There, the Court reaffirmed that state officials are not liable for injuries resulting from violent acts by third parties, explaining, "our cases have recognized that Due Process Clauses generally confer no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." *Id.* at 196.

This Court has endorsed two exceptions to *DeShaney* whereby state actors have an affirmative duty of care and protection: (1) the "special relationship" exception, and (2) the state-created danger exception. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). The

08-1931, *Culp, et al v. Rutledge, et al.*

latter exception applies when the state either plays a role in creating a danger to an individual or renders an individual more vulnerable to a pre-existing danger. *See id.* at 1066; *see Jones v. Union County, Tennessee*, 296 F.3d 417, 428 (6th Cir. 2002) (noting that a state-created danger arises when the state, or an agent thereof, affirmatively acts to expose an individual to potential danger).

Under the state-created danger theory, a governmental actor can be held responsible for an injury committed by a private person if:

(1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person;

(2) the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and

(3) the governmental actor had the requisite degree of culpability.

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Ed.*, 542 F.3d 529, 535 (6th Cir. 2008) (citing *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (finding that "state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way").

Plaintiffs claim that Sergeant Cooper is liable to Plaintiffs under a state-created danger theory because she created a dangerous situation when she told the Williams family that the police would arrest Collins but did not follow through with the arrest. The district court rejected Plaintiffs' theory because it found that they failed to establish the first and second prongs of the three-part analysis required to find the existence of a state-created danger. The court explained that there was no evidence that Sergeant Cooper had undertaken any affirmative act that either created or increased the risk that Plaintiffs would be exposed to an act of violence by Collins and no evidence that

Sergeant Cooper knew or should have known that her actions could specifically endanger Plaintiffs. Because we agree that Plaintiffs have not put forth evidence sufficient to establish the first prong of the state-created danger analysis, we affirm the district court's decision.

**C.      There is no evidence that Sergeant Cooper engaged in an affirmative act that created or increased the risk that Plaintiffs would be exposed to Collins's violence**

As noted *supra*, to set forth a claim of state-created danger, Plaintiffs must first show that Sergeant Cooper took an affirmative act that either created or increased the risk that Plaintiffs would be exposed to the injurious conduct of the private person.  Plaintiffs argue that Sergeant Cooper created a dangerous situation for Plaintiffs by telling Jamika and Culp that Collins would be arrested but failing to take any further action on Jamika's February 1, 2006 complaint.  Specifically, Plaintiffs assert that because Sergeant Cooper assured Jamika and Culp that Collins would be arrested, Jamika told Collins's brother, Denzel, that she had filed a formal complaint against Collins, increasing Collins's anger at Jamika and endangering both Jamika and the rest of her family.  Plaintiffs also assert that various members of the Williams family returned to Zion Church only because they mistakenly assumed that Collins was in jail.

The district court rejected Plaintiffs' arguments, explaining that there was no evidence that Sergeant Cooper's alleged inaction increased the risk to Plaintiffs.  The court reasoned:

> Collins created the danger to [P]laintiffs; [Sergeant] Cooper did not encourage the plaintiffs to go back to the church. . . Also, even if [P]laintiffs relied on Sergeant Cooper's assurances that Collins would be arrested in continuing to attend services at the church, the causal link to the attack is attenuated because Collins could have attacked the [P]laintiffs anywhere at any time. . . There is a further problem with the [P]laintiffs' claim that Cooper created or increased the risk that Collins would have made the shooting any less likely to occur because even if Collins had been arrested[,] he likely would have been able to post bail and remain free. . . Collins was gainfully employed and likely would have been able to post bond . . . [and] carry out

08-1931, *Culp, et al v. Rutledge, et al.*

> the shooting in exactly the same manner. It is speculative for [P]laintiffs to say he would not have done so—they have presented no evidence in this regard.

(ROA 798-99.)

The court also found Plaintiff's argument "weak" in light of the Seventh Circuit's decision in *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir. 1991). In *Losinski*, a sheriff's deputy accompanied Julie Losinski, at her request, to her estranged husband's trailer to collect her belongings. *Id.* at 547-48. Aware of the husband's violent tendencies and the fact that Mrs. Losinski had a temporary restraining order against him, the deputy stood in the hallway as the couple argued and did not intervene until Mr. Losinski produced a loaded gun and shot and killed his wife. *Id.* The Seventh Circuit found no § 1983 liability because it determined that though the deputy failed to protect Mrs. Losinski from a known danger, he had not initiated the state action: "Although the state walked with [Mrs. Losinski] as she approached the 'lion's den,' it did not force her to proceed. It did not encourage her to continue. And once the group arrived at the house on September 13, it did not require her to stay." *Id.* at 550-51. The district court found the facts of the instant case analogous, noting: "Collins created the danger to the [P]laintiffs; Cooper did not encourage the [P]laintiffs to go back to the church." (ROA 799.) We agree.

As a threshold matter, we reject Plaintiffs' assertion that Sergeant Cooper's apparent act of witnessing Jamika's domestic violence complaint was an affirmative act that greatly increased the possible danger that Collins could cause to the Williams family. Here, even viewing the evidence in the light most favorable to Plaintiffs and assuming that Sergeant Cooper took Jamika's witness statement as she described, Sergeant Cooper's only possible affirmative actions were to finalize and witness Jamika's written report, photograph Jamika's injuries, and inform her that the police would

08-1931, *Culp, et al v. Rutledge, et al.*

try to obtain an arrest warrant for Collins. Considering Sergeant Cooper's testimony about the standard procedures for "not-in-custody" domestic violence cases, even accepting Plaintiffs' assertion that Jamika filed a formal complaint on the evening of February 1, 2006, she would have still had to return to the Unit to meet with a prosecutor and carry out the necessary steps before the police could arrest Collins—a process that could take several weeks. Further, although Plaintiffs blame Sergeant Cooper for Jamika's decision to notify Collins's brother that she formally complained to the police, we have previously rejected this type of attenuated causation. *See, e.g.*, *Jones v. Reynolds*, 438 F.3d 685, 692 (6th Cir. 2006) (finding that plaintiff could not establish that the officers "increased" her risk of danger when they failed to stop the drag race that led to her injury); *Bullard v. Inkster Hous. & Re-Dev. Comm'n*, 126 F. App'x 718, 720 (6th Cir. 2005) (finding that failing to provide adequate security measures for an apartment door to prevent break-ins was not an affirmative act).

In this way, any failure by Sergeant Cooper to follow up on Jamika's domestic violence claim constitutes *inaction*, which does not qualify as an affirmative act under a state-created danger theory. *See Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006) (noting that a "failure to act is not an affirmative act under the state-created danger theory") (citing *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005) (failing to respond to parental complaints about the lack of enforcement of a residential speed limit was not an affirmative act); *Jones*, 296 F.3d at 431 (failing to serve an ex parte protection order on an abusive spouse was not an affirmative act); *Sheets v. Mullins*, 287 F.3d 581, 588-89 (6th Cir. 2002) (failing to pursue and investigate a domestic-disturbance call was not an affirmative act); *Weeks v. Portage County Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000) (failing to call an ambulance for an obviously injured citizen was not an

08-1931, *Culp, et al v. Rutledge, et al.*

affirmative act); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995) (taking seizure victim home rather than failing to obtain immediate medical attention for her was not an affirmative act); *see also Losinski*, 946 F.2d at 550-51 (failing to intervene in couple's dispute when wife returned to estranged husband's home to gather personal belongings was not an affirmative act).

Moreover, as the district court noted, even if Collins had been arrested, given that he was gainfully employed, he would likely have been able to post the $500 maximum bond authorized under Michigan's assault statute and would have been able to carry out an attack on Plaintiffs anywhere, be it at Zion Church or some other location. *See* Mich. Comp. Laws §§ 750.81(1), 780.581(2)). Thus, Plaintiffs' assertions that Collins's arrest would have wholly prevented him from carrying out his violent attack is based upon their own unsupported speculation, which are insufficient to defeat summary judgment for Sergeant Cooper. *See* Fed. R. Civ. P. 56(e); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990).

**D.**     **Plaintiffs have also failed to establish the second and third prongs of the state-created danger analysis**

Although Plaintiffs' failure to establish the first prong of the three-part state-created danger test is fatal to their claim, Plaintiffs have also failed to establish the second and third prongs. First, Plaintiffs have put forth no evidence to support their assertion that the district court erred by finding no evidence that Sergeant Cooper should have known that a failure to arrest Collins would pose a specific risk to Plaintiffs. *See Jones*, 438 F.3d at 696 (quoting *Kallstrom*, 136 F.3d at 1066) ("A special danger exists 'where the state's actions place the victim specifically at risk as distinguished from a risk that affects the public at large.'"). Second, Plaintiffs' unsupported claims that Sergeant

Cooper should have foreseen that the entire Williams family could be injured by her failure to effectuate an arrest warrant for Collins are not enough to show that Sergeant Cooper acted with "deliberate indifference" toward them. *See McQueen v. Beecher Comm. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (to show deliberate indifference, a plaintiff must show that the state was aware of facts from which he could draw an inference that a substantial risk of serious harm exists).

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.

08-1931, *Culp, et al v. Rutledge, et al.*

**WHITE, Circuit Judge, concurring.** In addition to the "special danger" element of a state-created danger case, there is a foreseeability requirement. *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F. 3d 592, 609 (6th Cir. 2007). In *Powers*, we explained:

> The Supreme Court has stated that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Relying on this language, courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable.

*Id.* (citation omitted).

Plaintiffs have not established a genuine issue whether it was foreseeable that Sergeant Cooper's leading plaintiffs to believe that Collins would be arrested would result in Collins shooting Rosetta. Jamika reported Collins's February 1 misdemeanor assault involving no weapon to Sergeant Cooper that same night. It was not foreseeable at that time—when Sergeant Cooper allegedly informed plaintiffs that Collins would be arrested and then failed to obtain an arrest warrant—that three weeks later, Collins would shoot and kill Jamika's mother.