NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0038n.06

Case No. 25-1305

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CODY BOONE, Personal Representative of the Estate of James Kenneth Boone, | ) ) ) | **FILED** Jan 21, 2026 KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| OTTAWA COUNTY CENTRAL DISPATCH AUTHORITY, a Michigan governmental agency; NICOLE JEAN WENTWORTH, KATHERINE LEE COENEN, RYAN A. CULVER, and MEAGAN ANN ROSS, individually and in official capacities, | ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| Defendants-Appellees, | ) ) | OPINION |
| TRACY JO OOMEN; PAULA SUE HOOKER; MARY C. ALLMAN, | ) ) ) | |
| Defendants. | ) ) | |

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. On December 1, 2019, Kenneth Boone called 911 and reported that he had beaten his father James to death with a hammer. Kenneth had initially called 911 one hour before, at which time James took the phone and told Ottawa County Central Dispatch Authority ("OCCDA") telecommunicators that Kenneth had stopped taking his schizophrenia medicine and had threatened him. James also explained that Kenneth wanted to be arrested because Kenneth knew that he might "do something bad" to his father. Despite this warning, OCCDA telecommunicators assigned the call a code that did not make it a top priority. Because all officers were busy at the time, the call sat pending without a response, and no OCCDA

employee radioed police to alert them to the incident. Kenneth killed James before emergency services were dispatched.

James's estate sued the OCCDA and seven of its employees in Michigan state court asserting a substantive due process claim based on an alleged state-created danger, a *Monell* liability claim, and several state tort claims. Defendants removed the case to federal court and, after completing discovery, moved for summary judgment. The district court granted summary judgment on the federal claims and declined to exercise supplemental jurisdiction over the remaining state claims. While this case involves undeniably tragic circumstances, we find that the defendants did not violate James's constitutional rights and therefore affirm the district court's grant of summary judgment to the defendants.

## I.

### A.

The OCCDA provides 24-hour emergency communications support to Ottawa County's police, fire, and emergency medical services agencies. When someone in Ottawa County calls 911, they are connected to the OCCDA, which is operated at any given time by four telecommunicators[1] and a supervisor.

OCCDA telecommunicators serve two primary roles. They first work as "call takers." DE 112-5, Wentworth Dep., Page ID 1870; DE 112-5, Ross Dep., Page ID 2086. A telecommunicator is a call taker when answering an incoming emergency call, which any telecommunicator may take depending on availability. In real time, a call taker gathers information from the caller and enters that information into the Computer Aided Dispatch ("CAD") system. A call taker then gives the

---

[1] The OCCDA refers to its employees as "telecommunicators" and "dispatchers" interchangeably. DE 112-5, Culver Dep., Page ID 1984. To avoid confusion with the OCCDA employees' dispatching responsibilities, we refer to them as telecommunicators in this opinion.

incident a call type code.  Based on the code used, the CAD system automatically assigns the incident a priority between one and five, which indicates the urgency with which emergency services should respond.[2]

Second, telecommunicators act as "dispatchers."  DE 112-5, Coenen Dep., Page ID 1922; DE 112-5, Wentworth Dep., Page ID 1870.  Each telecommunicator is assigned to dispatch for a different emergency agency during a shift.  The OCCDA coordinates with four agencies: City Police, County Police, Fire, and Tactical.  Once a call taker enters the CAD notes and assigns the incident a code, the code taker marks the call as "ready for dispatch," which transfers the matter to the dispatcher who is assigned to the relevant agency.  DE 112-5, Wentworth Dep., Page ID 1879.  At this point, it is that dispatcher's responsibility to coordinate within the dispatch authority to send emergency services.

Dispatchers work with emergency services to prioritize higher priority calls before lower priority ones.  When a priority one call is pending, dispatchers are instructed to pre-broadcast (i.e., alert by radio) the incident to on-duty officers.  Additionally, when a call involves a life-threatening emergency, dispatchers may engage a deputy from a nearby village for help.  But even when a dispatcher thinks a call is an emergency that warrants engaging that deputy, the dispatcher must still get permission from a police supervisor before doing so.

---

[2] Priority one calls are defined as "[i]n progress calls involving imminent threat to life or the possibility of injury."  DE 106-9, OCCDA Telephone Complaint/Report Processing Procedures Call Guides, Page ID 1321.  These include "in progress assaults . . ., robberies, injuries, medical emergencies, all fires, [and] crimes involving weapons."  *Id.*  Priority 2 calls, by contrast, involve "[i]n progress calls involving criminal activities where the threat involves property only, [and] crimes against persons[] not in progress."  *Id.*  The OCCDA directs telecommunicators to dispatch first "[a]ny call involving immediate threat to . . . or the possibility of an immediate threat [to a citizen's] well-being."  *Id.*

**B.**

On December 1, 2019, at 6:16 AM, Kenneth Boone called 911 and spoke with Nicole Wentworth, an OCCDA telecommunicator working as the City Police dispatcher. Kenneth told Wentworth that he was "not feeling safe with [his] dad," and requested that police "[c]ome arrest me." DE 112-2, 911 Call Transcript, Page ID 1709. Kenneth continued that his father, James, was "not acting like himself" and that James was "threatening" and "scaring" him. *Id.* James then took the phone and stated that, in fact, Kenneth was threatening him. James explained that Kenneth was not taking his Depakote medication, which he took for "[m]ental illness." *Id.* at 1710–11.

When questioned, James said that there were no weapons or children at the home, and that no one had been drinking or doing drugs. And when Wentworth asked whether "anybody [had] been physically assaulted," James responded, "[n]ot yet, no." *Id.* at 1711. James explained, however, that Kenneth had requested that police arrest him because Kenneth knew "he could do something bad to" James. *Id.* at 1712. Although James said Kenneth was not actively making any threats, he noted that Kenneth had woken him up in the middle of the night and was "starting to get in [his] face and double fist his fists." *Id.* Wentworth told James that she would "get an officer out that way for [him]," noting that she wanted James "to stay safe," and "[i]f anything change[d] before" police arrived, James should "call [her] back immediately." *Id.* James thanked Wentworth and ended the call.

While speaking to the Boones, Wentworth contemporaneously entered the following information into the CAD system to summarize the conversation:

    6:16:38 AM:  Father yelling in the background
    6:16:44 AM:  Saying that he is being threatened
    6:17:05 AM:  Now talking to the father / son is off his meds for mental illness
    6:17:15 AM:  No weapons / no aslt / no kids

6:17:46 AM:   Son Kenneth John Boone 2.11.94

6:18:53 AM:   James Kenneth Boone 05.09.55

DE 112-2, Call for Service Detail Report, Page ID 1660. At 6:16 AM, Wentworth entered the call into the CAD system as a "disturbance in progress," which automatically populated the incident as priority two. *Id.* at 1665; DE 112-5, McWatters Dep., Page ID 2005. During the call, Wentworth viewed the Boone residence's call history, which showed five 911 calls within the past three months. In one prior call, James told an OCCDA call taker that Kenneth was suicidal, schizophrenic, and had been having mental issues. In another, Kenneth overdosed on Klonopin, ate toothpaste, and burned his back on a tanning bed. But no prior call had described Kenneth as violent to others or suggested that there were weapons at the residence.

After inputting the call notes into the CAD system and reviewing the Boone residence's call history, Wentworth marked the call as "ready for dispatch" at 6:18 AM. DE 112-2, Call for Service Report, Page ID 1665. Because the Boones lived in Ottowa County and therefore outside of the City Police's jurisdiction, Wentworth sent the call to Katherine Coenen, the County Police dispatcher. After speaking with Wentworth and reviewing the CAD narrative, Coenen recategorized the call to a "mental in progress." DE 112-5, McWatters Dep., Page ID 2005; DE 112-2, Call for Service Report, Page ID 1665. Like a "disturbance," a "mental" is automatically categorized as priority two in the CAD system. Because no officers were available to respond, the call was "held in the pending cue" while awaiting dispatch. DE 112-5, Coenen Dep., Page ID 1927, 1930.

At 6:36 AM, Ryan Culver replaced Coenen as the County Police dispatcher. Culver discussed the Boone call with Coenen before she left. Neither Coenen nor Culver pre-broadcast the incident to on-duty officers or sought to engage an available deputy from the nearby village to help.

At 7:24 AM, Kenneth called 911 a second time and spoke to Culver. Kenneth stated that he killed James with a hammer and asked police to "[c]ome lock [him] up." DE 112-2, 911 Call Transcript, Page ID 1713. After arriving on the scene, police found James deceased and subsequently located Kenneth several houses away holding a hammer with bloody hands.

Megan Ross, an OCCDA supervisor, was present for both 911 calls made by Kenneth. Although Ross opened the initial call's CAD narrative and remembered seeing it pending, she did not see anything that made her think that she needed to immediately dispatch or pre-broadcast the call. Consistent with the OCCDA's practices, Coenen, Culver, and Ross did not listen to the Boones' original 911 call themselves.

After the incident, OCCDA Executive Director Peter McWatters investigated and issued a report regarding the circumstances that led to James's death. McWatters concluded that while Wentworth's decision to code the Boone call a priority two "'[d]isturbance' was not inaccurate," it would have been more appropriate to code it a priority one "Domestic – In Progress." DE 112-2, McWatters Investigative Report, Page ID 1782. McWatters also found that Wentworth should have included more detailed information in the CAD system about Ken's threats and Ken's and James's statements. These mistakes resulted in "Coenen and Culver lack[ing] a full understanding of the nature [and potential seriousness] of the call." *Id.* The OCCDA thus issued Wentworth a written

reprimand and required her to complete supplemental training. The OCCDA also issued Coenen and Culver a written counseling for failing to contact a police supervisor about whether to continue to hold the call or to engage a deputy from the nearby village to help. Ross received a written reprimand for the same reason.

In November 2022, Cody Boone, James's son and personal representative of his estate ("the estate"), sued the OCCDA and seven of its employees in Michigan state court. The estate made several state tort claims and, as relevant here, two federal claims. The estate first alleged under 18 U.S.C. § 1983 that the individual defendants violated James's substantive due process rights by failing to timely dispatch emergency services to the Boone residence. Second, the estate sued the OCCDA alleging that James's due process rights were violated because the OCCDA failed to establish policies or properly train its employees on how to respond to 911 calls involving threats of harm by mentally ill people.

Defendants removed the lawsuit based on the federal causes of action in the complaint. After discovery, the district court granted summary judgment to the defendants on the federal claims and declined to exercise supplemental jurisdiction over the remaining state law claims. The estate timely appealed.

## II.

We review the district court's grant of summary judgment de novo. *Stiles, ex rel. D.S. v. Grainger County*, 819 F.3d 834, 847 (6th Cir. 2016). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence

for a trier of fact to find for that party." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015).

## III.

## A.

The estate first argues that the district court erred by granting summary judgment for the individual defendants—Wentworth, Coenen, Culver, and Ross[3]—on its state-created danger claim. The individual defendants respond that they are entitled to qualified immunity.

State officials are shielded "from money damages unless a plaintiff" shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation modified). The estate has the burden to satisfy both prongs of this test. *Sexton v. Cernuto*, 18 F.4th 177, 184 (6th Cir. 2021). We may address these questions in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and, in this case, begin with the question of whether the individual defendants violated James's constitutional rights. If we find no constitutional violation occurred, we need not address whether the right was clearly established. *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The Fourteenth Amendment generally "regulates only the state's actions—not those of private actors." *Franz v. Oxford Cmty. Sch. Dist.*, 132 F.4th 447, 451 (6th Cir. 2025). But we recognize "limited circumstances" where "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney v. Winnebago Cnty.*

---

[3] The estate does not appeal the district court's grant of summary judgment to the other three individual defendants, Tracy Oomen, Paula Hooker, and Mary Allman, all of whom have been dismissed from the case.

*Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989). One such circumstance is the state-created danger theory, which allows plaintiffs to hold the government liable for harms caused by private actors when the government has made them "more vulnerable" to those dangers. *Id.* at 201.[4] Under this "demanding standard," plaintiffs, first, "must show an affirmative act by the state which either created or increased the risk that they would be exposed to an act of violence by a third party." *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448–49 (6th Cir. 2021) (citation modified). Second, they must establish that there was a "special danger to them," such that "the state's actions placed them specifically at risk, as distinguished from a risk that affects the public at large." *Id.* (citation modified). And third, "they must show that the state was aware of the 'substantial risk of serious harm' and responded in a way that was 'conscience shocking.'" *Id.* (quoting *Doe v. Jackson Loc. Sch. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)).

Whether a plaintiff can satisfy the affirmative act requirement is often a difficult question. *Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020). The mere failure to act does not suffice. *Id.* Instead, our analysis "focuse[s] on whether the victim was safer before the state action than he was after it." *Id.* (citation modified). For example, we have found that an official did not increase the risk to a victim where the official "[f]ail[ed] to punish or insufficiently punish[ed] [an] assailant[],"

---

[4] The estate cites several cases involving the other exception noted in *Deshaney*, referred to as the special relationship exception, which arises when the plaintiff and state have a relationship such that the state has an affirmative duty to protect the plaintiff from harm caused by third parties. *See Deshaney*, 489 U.S. at 197–200. We disregard these cases for two reasons. First, the district court properly found any claim based on a purported special relationship was waived (or at least forfeited) because the estate did not respond to the defendants' argument at summary judgment that there were no facts supporting the existence of such a relationship. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018). The estate's failure to address this in its response to the motion for summary judgment also means it is waived on appeal. *Id.* And second, even if it were not waived, the special relationship exception is inapposite here because James was not in state custody when Kenneth killed him. *See Lipman v. Budish*, 974 F.3d 726, 742–43 (6th Cir. 2020).

"[i]gnor[ed] a dangerous situation," and "[e]ven affirmatively return[ed] a victim to a preexisting situation of danger." *Stiles*, 819 F.3d at 854–55. Ultimately, the plaintiff must show that the defendants' actions created a position worse "than the one in which they would have been had the defendants 'not acted at all.'" *Franz*, 132 F.4th at 451 (quoting *Deshaney*, 489 U.S. at 201). Here, the district court rejected the estate's state-created danger claim against each of the individual defendants because it found that none of them engaged in the type of affirmative conduct that satisfies this first element. We agree.

We find that the estate's claim against Wentworth fails because she did not take any affirmative acts that created or increased the risk that James would be harmed by Kenneth. The estate argues that Wentworth's "assurance that help was on the way coupled with the failure to dispatch the police" increased the risk that Kenneth would harm James. CA6 R. 26, Appellant's Br., at 27. Specifically, it asserts that Wentworth's assurances—and the subsequent delay—outraged Kenneth and made James less likely to "take alternative measures to protect himself." *Id.* at 28. But, as the Supreme Court stated in *Deshaney*, no "affirmative duty to protect arises . . . from [the State's] expressions of intent to help." 489 U.S. at 200. Thus, even if James "relied on [Wentworth's] assurances that" an officer was coming, her statements do not support liability here. *Brooks v. Knapp*, 221 F. App'x 402, 407 (6th Cir. 2007); *accord Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012) ("The reason those false assurances do not constitute an affirmative act rendering decedent vulnerable to danger within the meaning of the danger creation exception is the same reason those assurances do not constitute an affirmative act in restraint of decedent's liberty within the meaning of the special relationship exception— *DeShaney* tells us so.").

In any event, the estate has produced no evidence indicating that Wentworth's assurances to James made him less likely "to take alternative measures to protect himself." CA6 R. 26, Appellant's Br., at 28. Although the estate's expert, Mary McIlvain, suggests that Wentworth's statements "likely contributed to [James's] false sense of security or delayed alternative protective actions he might have taken," her conclusion is uncorroborated by any factual evidence in the record. DE 112-5, McIlvain Expert Report, Page ID 2387. This claim therefore amounts to mere "unsupported speculation," which cannot "defeat summary judgment" for the OCCDA employees. *Culp v. Rutledge*, 343 F. App'x 128, 136 (6th Cir. 2009); *see also FDIC v. Jeff Miller Stables*, 573 F.3d 289, 299–300 (6th Cir. 2009) (holding that unsupported assertions and conclusory allegations are insufficient to overcome a motion for summary judgment).

Nor can Wentworth's mischaracterization of the Boone 911 call as a priority two incident support liability here. Viewing the facts in the light most favorable to the estate, Wentworth's entry did not accurately convey the seriousness of the incident. Indeed, the OCCDA reprimanded Wentworth for her failure to code the call a priority one "Domestic – In Progress," and several of Wentworth's fellow telecommunicators thought she improperly categorized the call. Had Wentworth properly coded the call, it is possible that police would have intervened sooner, and Kenneth would not have killed James. We find these circumstances "deeply troubling," and note that they may suggest that Wentworth is not "faultless" in James's death. *May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 586 (6th Cir. 2006). Still, Wentworth's conduct does not satisfy the first element of the state-created danger test because there is no evidence that it "directly increased [James's] vulnerability to danger or placed [him] in harm's way." *Id.* Even before Kenneth called the police, he had stopped taking his medication for schizophrenia and had "start[ed] to get in [James's] face and double fist his fists." DE 112-2, 911 Call Transcript, Page ID 1710–12.

Thus, at most, Wentworth's conduct returned James "to a preexisting situation of danger." *Stiles*, 819 F.3d at 855. There are no facts showing that Wentworth put James in a "'worse position' than the one in which [he] would have been had [Wentworth] 'not acted at all.'" *Franz*, 132 F.4th at 451 (quoting *Deshaney*, 489 U.S. at 201).

We can also quickly reject the claims against Coenen, Culver, and Ross. The record shows that these defendants did not dispatch emergency services before Kenneth killed James, did not listen to the Boones' original 911 call, did not pre-broadcast the incident to on-duty officers, and did not contact the police supervisor to request permission to dispatch the available village deputy to the Boone residence. But these delays and omissions, while tragic, are "at most, a failure to act," which are "not . . . affirmative act[s] under the state-created danger theory." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003); *see also Stiles*, 819 F.3d at 855 ("Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [a law enforcement officer] are plainly omissions rather than affirmative acts."); *Reilly v. Ottawa County*, 2021 WL 3929324, at *6 (6th Cir. Sept. 2, 2021) (noting that "defendants' failure to follow through in a timely and forceful manner . . . does not identify an affirmative act that created [or increased] a danger . . . [and therefore] cannot support a viable claim"). Coenen's recategorizing the Boone call from a disturbance in progress to a mental in progress does not satisfy this first element either. There is no evidence that Coenen's change—which maintained the same call type priority and thus indicated the same urgency level to police—caused James to be less safe than before Coenen acted. *See Lipman*, 974 F.3d at 744.

In sum, even when drawing all reasonable inferences in the estate's favor, the record does not support a finding that the individual OCCDA defendants engaged in an affirmative act that created or increased the danger to James. For this reason, we affirm the district court's grant of summary judgment to Wentworth, Coenen, Culver, and Ross.

**B.**

The estate also argues that the district court erred when it granted summary judgment for the OCCDA. The estate makes two claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978): first, that the OCCDA maintained an unconstitutional custom, policy, or practice of responding to 911 calls; and second, that it failed to train its telecommunicators on how to properly respond to callers that threatened suicide or harm to others.

To hold a county liable under § 1983, "a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015). A county's policy or custom "that causes a plaintiff's constitutional injury may serve as the basis for § 1983 liability." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286 (6th Cir. 2020). So too can a county's failure to train its employees. *Martinez v. Wayne County*, 142 F.4th 828, 844 (6th Cir. 2025).

"Regardless of the asserted theory," however, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Id.* (alteration in original) (quoting *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023)); *see also Codrington v. Dolak*, 142 F.4th 884, 896 (6th Cir. 2025) ("[Plaintiff's] *Monell*-related arguments on appeal rise and fall with the success of his § 1983 claims."). And here, the estate has not shown that the OCCDA or any of its employees are liable under a substantive due process theory. Because James has not suffered a

constitutional violation, we find that the district court properly granted summary judgment for the OCCDA on these claims as well.[5]

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

---

[5] In its complaint, the estate raised state tort law claims against the OCCDA and its employees. The district court declined to exercise supplemental jurisdiction over these claims after it dismissed the estate's federal claims. Because the estate does not contest this ruling on appeal, we do not address those claims here.