RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JACOB ANDREWS, Personal Representative of the
Estate of Angela White, Deceased,

*Plaintiff-Appellant*,

*v.*

WAYNE COUNTY, MICHIGAN,

*Defendant-Appellee*.

No. 19-1992

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11684—Paul D. Borman, District Judge.

Decided and Filed: May 4, 2020

Before: SUHRHEINRICH, BUSH, and MURPHY, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** John C. Kaplansky, LAW OFFICE OF JOHN C. KAPLANSKY, P.C., Bingham
Farms, Michigan, Robert M. Sosin, ALSPECTOR, SOSIN & NOVECK, Bingham Farms,
Michigan, for Appellant. Sue Hammoud, WAYNE COUNTY CORPORATION COUNSEL,
Detroit, Michigan, for Appellee.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.

## I.  INTRODUCTION

In *Gray v. City of Detroit*, we observed that "[s]uicide is a difficult event to predict and prevent and often occurs without warning."  399 F.3d 612, 616 (6th Cir. 2005).  That is the sad reality in this case.  Angela White overdosed on blood pressure medication while a pretrial detainee at Defendant-Appellee Wayne County's Jail ("County" or "Jail") and died.  White had been permitted to keep 45 pills on her person pursuant to Wayne County Jail's "Keep on Person" ("KOP") program, which allows inmates to keep with them certain drugs for self-administration. In this § 1983 action White's former fiancé, Jacob Andrews, alleges that the Jail's KOP policy and inmate intake policy violate the constitutional rights of inmates and pretrial detainees like White who are emotionally unstable and potentially suicidal.  The district court granted summary judgment to the County, holding that the facts did not establish municipal liability or deliberate indifference toward White.  This appeal follows.

## II.  BACKGROUND

### A.  Facts

On June 5, 2014, at 4:45 a.m., the City of Canton Police Department received a 911 phone call from Andrews.  Andrews left the line open, allowing police to hear "loud arguing between a male and female," and the female's reference to "slitting your throat."  Andrews told the police dispatched to the scene that he and White were engaged, had been together over three years, and had a child together.  Andrews relayed that he had been drinking tequila at his brother's house nearby and fell asleep there.  He got a phone call from a "highly agitated" White and went home.  Andrews stated that White physically attacked him after he got into bed and poked him in the chest with a kitchen knife.  That's when he called 911.  The Canton police determined that White was the aggressor and arrested her.

Later that morning White called Andrews, apologized, and asked him to bring her medications to the Canton Police Department. Andrews dropped off five or six bottles. He did not speak to White.

Just after 8:00 p.m. that evening White was taken to Oakwood Hospital after complaining of a headache and chest and back pain. She was released at 2:15 a.m. on June 6 and returned to the Canton Jail.

Later the same day White was arraigned in the 35th District Court on a charge of felony assault with a dangerous weapon. Bail was set at $3,000 with a 10 percent cash/surety bond and a preliminary hearing was scheduled for June 20, 2014. Andrews did not post White's bond. She was transferred to the Jail about 7:00 p.m. that evening. Along with White were her six medications: (1) Klonopin, (2) oxygen, (3) Sumatriptan, (4) Verapamil, (5) Toradol, and (6) Lexapro.

The Jail's "Receiving Screening - Intake" policy requires all incoming inmates to be screened within four hours of arrival booking. The express purpose of the policy is "to identify and appropriately direct inmates who have health and/or safety issues that require timely intervention." White was seen at 8:39 p.m. by Medical Assistant Dawn Benette, who worked in the intake unit. Benette asked White a series of questions about her medical and mental history, using the intake screening questionnaire. Key questions and responses included:

> Was the inmate taken to the hospital prior to arrival at intake:
> > **Yes**
> > Explain: [Blank]
> …
> Is the inmate taking medications?
> > **No**
> …
> Have you ever attempted to harm yourself or commit suicide?
> > **Yes**
> > Explain: In the past
> Are you thinking of harming yourself or are suicide thoughts a problem now?
> > **No**
> > Explain: [Blank]
> Do you have a history of psychiatric illness or treatment?
> > **No**
> > Explain: [Blank]

Benette also made her own observations in response to certain questions.  She recorded that White was not acting or talking in a strange manner, did not show signs of depression, was not overly anxious, and was not shy or ashamed.  Benette cleared White for housing in the general prison population and referred her for a medical and a mental evaluation.

Because Benette had flagged White for further evaluation, R.N. Raymond Carnill evaluated her about 10:15 p.m., in a session that lasted nearly two hours.  Carnill did not review Benette's intake form.  He conducted his own history and assessment of White,[1] using a separate questionnaire.  Carnill noted that White had bad cluster headaches and was taking medications for anxiety.  Carnill reported White's chief complaints were "anxiety and depression."  Carnill noted that White denied being suicidal or homicidal.  He described her behavior as "soft," her speech as "cooperative," her mood as "anxious."

Carnill contacted a pharmacy to verify White's prescriptions and obtained orders to continue them.  Carnill also filled out a "PSY Referral" form directing that White be seen by the "psychiatric social worker" and that the "on call psychiatrist" be contacted.  On that form he listed that White's "chief complaint" was "anxiety and depression," that she was taking Lexapro and Klonopin, and that she "[d]eines [sic] being suicidal or homicidal."  Carnill testified that he did not execute the KOP policy because his shift ended.  The briefing does not make clear who actually allowed White to keep her Verapamil.

In his deposition testimony Carnill reiterated that during the two hours he spent with her, White did not exhibit any psychotic behavior, suicidal ideation, or psychiatric distress.  For these reasons, he did not admit her to the mental health unit.  He placed her in a special housing unit, the infirmary, which is adjacent to the medical clinic, so she could access her oxygen tank as needed.

Carnill further testified that had he perceived that White might harm herself, he "would have called the psychiatrist . . . [and] I would have had her admitted to the mental health floor under suicide interventions."  Knowledge of a prior suicide attempt would not have been a game

---

[1]Carnill also explained that the purpose of the intake form is "to get an initial overview of what's going on with the inmate and to [see] whether they need further services."

changer because Carnill "base[d] [his] evaluation upon the here and now rather than what's occurred in the past."

The next day, June 7, White made twelve outside phone calls on the Jail payphone system, half to Andrews. Andrews did not answer them and White became visibly upset. White was returned to her cell at 3:23 p.m. A moment later, Wayne County Sheriff's Deputy Christopher Paulsen conducted a security round of the unit. He noted that "all appears secure." At 4:25 p.m., however, Paulsen heard knocking and went to White's cell. She was sitting on the floor with traces of vomit on her face. White told Paulsen that she did not feel well. He immediately contacted medical personnel. Nurse Rhonda Harris came to White's cell, evaluated her, and "stated [that] she needed to contact the doctor."

Paulsen left to serve dinner to the infirmary unit. On his next security round about ten minutes later, he asked White if she wanted her meal tray. White responded repeatedly that she "took to [sic] many pills." Paulsen dashed to the clinic and told Nurse Harris. While en route, he had his shift command notified of the incident. Nurse Harris contacted Nurse DeAngela Guest. Guest ran to the Infirmary. White was on the floor but still talking. Guest took her vital signs, which were very low, 60/33. The nurses tried to keep her alert. White remained conscious.

EMS arrived at 5:00 p.m. and took over White's care. EMS transported her to Detroit Receiving Hospital at 5:30 p.m. Just after 2:30 p.m. the next day, June 8, White was found to be bradycardic. After sixty minutes of CPR, she was pronounced dead. An autopsy deemed the cause of death as Verapamil toxicity and the manner of death as suicide.

### B. White's Psychiatric History

Unbeknownst to the Canton Police Department or the Jail staff, White had recently visited several other area hospitals. On May 14, 2014, she spent two days at the Henry Ford Hospital Kingswood Facility ("Kingswood") after being diagnosed with major depressive order (moderate), chronic headaches, insomnia, and anxiety. While a patient there, she was put on suicide precautions, although she "denied overt suicidal ideations." White was discharged on May 16, 2014.

From May 22 through May 26, 2014, White had been admitted to Sinai Grace Hospital in Detroit, presenting with an altered mental state. White reported that she had been "seen in the past for depression and suicide attempt by Seroquel overdose by Psych consult service." There is no indication when the attempt occurred.

White was also seen on May 7, May 21, and May 28, 2014, by the University of Michigan Neurology Headache Clinic for an evaluation and follow-up care for chronic left-sided headache. She received treatment for cellulitis at the University of Michigan Hospital on May 31, 2014.

White did not report any of these hospital visits to the Canton Police or the Jail. Neither did Andrews.

### C.  The KOP Policy

The Jail's KOP Policy has been in effect, subject to revisions, since 1998. The Jail adopted the standards formulated by the National Commission of Correctional Healthcare. As revised in 2012, it provided:

> It is the policy of Wayne County Jail Health Services (WCJHS) that R.N.'s/L.P.N.'s [sic] shall distribute non restricted medications for the Self Medication Program to patient/inmates in the general population and medical special housing so that they can store and administer their own medications. All psychotropic medications for patients/inmates will be nurse dispensed regardless of the location of the inmate. *Inmate/patients who reside on the mental health unit will be excepted from the Self Medication Program and as such all medications to Mental Health Unit patients will be Nurse administered. WCJHS reserves the right to restrict self administration privileges to any inmate if necessary, to assure the safety and security of the patient, other inmates or the institution.* A current drug list will be posted in all medication books and clinical areas at all times.

(Emphasis added.) Thus, as of 2012, only patients housed on the mental health unit are excluded from participating in the KOP program.

Five categories of medications were on the "Nurse Administered Medications" list. These included: (1) tuberculosis medications, (2) miscellaneous drugs—including Catapres but not Verapamil, (3) psychotropic antidepressant medications, (4) psychotropic antipsychotic

medications, and (5) antiretroviral medications.  The Jail had identified these drugs as having "an abuse potential" or "warrant[ing] close monitoring for patient/inmate compliance."  The drugs on the list were "restricted to individual dose administration."

Medical Director Thomas Clafton, M.D.,[2] explained that medicines "known to be abused by inmates" made it to the list.  The blood pressure medication Catapres was listed under the "miscellaneous" category "because it's sedating, it's a sleeper.  The inmates know that they can take a bunch of that and it will make them go to sleep."  Dr. Keith Dlugokinski, Ph.D., the Director of Jail Health Services, also knew that Catapres had "some value on the trade market in the jail" because it has "sedating components" and "sleep is . . . a valuable commodity in the jail."  Verapamil, although also "an anti-hypertensive," was not on the list because it would not have the same effect.

Prior to the 2012 version, the KOP precluded any inmate on psychotropic medication from participating in the self-administration program.[3]  Thus, had White arrived at the Jail in 2009 instead of 2014, she would not have been permitted to keep any drugs with her, because she was taking two psychotropic medications, Klonopin and Lexapro.  Under the 2012 KOP Policy, White was allowed to participate in the program because she had not been placed on the mental health unit.

Not long after White's death, the KOP Policy was amended to add Verapamil to the "miscellaneous" drug category.

---

[2]Dr. Clafton no longer works for the Jail.

[3]The 2009 KOP Policy stated:

It is the policy of the Wayne County Jail Health Services (WCJHS) that R.N.'s/L.P.N.'s [sic] will distribute non restricted medications for the Self Medication Program to responsible patients/inmates in the general population only to carry and administer their own medications.  *The self medication program is restricted to patients/inmates who do not receive any psychotropic medications inclusive of the present restricted drug list.*  All psychotic [sic] medications for patients/inmates will be nurse dispensed regardless of his/her location.  A current drug list will be posted in all medication books and clinical areas at all times.  (Emphasis added)

**D.  Procedural History**

Andrews sued the County under 42 U.S.C. § 1983, alleging that its KOP Policy as well as its failure to train its personnel in suicide assessment policies were deliberately indifferent to White's serious medical needs.  The district court granted Wayne County's motion for summary judgment.  It held that the KOP Policy did not violate White's constitutional right to medical treatment because it (1) did not interfere with Carnill's follow-up interview of Benette's initial screening of White, (2) did not prevent Carnill from placing White on the mental health unit if she appeared mentally unstable, and (3) gave the Jail staff discretion to restrict inmates' access to medications and participation in the KOP program when they were not on the mental health unit if they were mentally ill or likely to abuse medication.  The district court rejected the failure-to-train claim because a detainee does not have a right to receive suicide screening unless the detainee demonstrates a strong likelihood of committing suicide and White did not.

Andrews appeals.

**III.  STANDARD OF REVIEW**

A district court's grant of summary judgment is reviewed de novo.  *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 855 (2020).  Summary judgment is proper "if there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

**IV.  ANALYSIS**

Pretrial detainees have a right to receive adequate medical attention under the Due Process Clause of the Fourteenth Amendment.  *Gray*, 399 F.3d at 616 (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  This includes psychological needs, "'especially when they result in suicidal tendencies.'"  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  "The 'right' that is truly at issue . . . is . . . the right to have steps taken that would have prevented suicide."  *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989).  A pretrial detainee does not have a general constitutional right to receive a suicide screening or to be placed on

suicide watch unless she manifests "a strong likelihood of committing suicide." *Gray*, 399 F.3d at 616; *see also Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992); *Danese*, 875 F.2d at 1244.

"[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). A municipality cannot be held liable simply because one of its employees has committed a constitutional violation. *Monell*, 436 U.S. at 694. In other words, a municipality is liable "only if the injury is caused by [the implementation of] a municipal custom or policy, or if the city's failure to train employees amounts to deliberate indifference to constitutional rights." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017); *Morgan v. Fairfield Cty.*, 903 F.3d 553, 565 (6th Cir. 2018) (same). "There are important differences between these types of claims," *Arrington-Bey*, 903 F.3d at 994, so they must be analyzed differently, *Morgan*, 903 F.3d at 566.[4]

## A.  Official Policy

"[W]hen an injury is caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy." *Morgan*, 903 F.3d at 566 (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364–65 (6th Cir. 1993)). The plaintiff must "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy." *Garner*, 8 F.3d at 364 (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)); *Morgan*, 903 F.3d at 566 (same).

Andrews offers several arguments for why the 2012 KOP Policy was "clearly constitutionally defective and just as plainly caused [White's] death."

---

[4]The County's argument that the deliberate indifference standard applies to official policy claims is untenable, as *Arrington-Bey* and *Morgan* make clear.

## 1. Defective on its Face[5]

Andrews argues that the KOP Policy is defective on its face for three reasons. First, it is based on where the inmate is housed and not upon the inmate's condition. Second, the KOP Policy does not require a suicide risk assessment prior to participation in the program. Third, the policy does not contain an automatic exclusion for individuals with a mental health history or who have previously attempted suicide.

Andrews' first assertion is flawed because, as the district court observed, it glosses over the fact that the KOP Policy does not dictate where an inmate is housed; the Jail staff make that decision, based upon an individualized assessment of the inmate. And, even if a patient otherwise qualifies for the program because she is housed in the general population, the Policy allows the Jail personnel "to restrict self administration privileges to any inmate if necessary, to assure the safety and security of the patient." Dr. Clafton also attested to this discretion. Carnill said the same—that the KOP did not restrict him from deeming White ineligible for the KOP if he perceived that White might be a danger to herself. The district court correctly rejected this argument.

Andrews' second argument fails because, as noted, a pretrial detainee does not have an automatic right to a suicide screening. *See Gray*, 399 F.3d at 616. As for the third argument, Andrews offers no explanation why a past suicide attempt makes a current one "clearly foreseeable" such that an automatic exclusion was required.[6] In fact, this court has held that a prison official's duty to recognize an inmate's risk of committing suicide has a temporal component. *See Linden v. Washtenaw Cty.*, 167 F. App'x 410, 421 (6th Cir. 2006) (holding that to be held liable, "a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life") (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)). In short, the KOP Policy is not defective on its face.

---

[5]We have reordered Andrews' arguments somewhat.

[6]The Jail did not have White's mental health history.

## 2. Policy Change

Andrews contends that the County deliberately changed its KOP policy in 2012 without justification or basis to allow individuals taking psychotropic drugs to participate. Under the 2009 version, White would have been automatically excluded from the KOP program because she was taking two psychotropic medications, Klonopin and Lexapro. Andrews points out that Dr. Clafton, the Jail's Medical Director, thought that the policy change was probably to clarify a "poorly worded" policy which according to Andrews is a poor reason to implement a policy that allows vulnerable persons to retain dangerous medications.

But Dr. Dlugokinski, who also signed off on the 2012 policy change along with Dr. Clafton, explained that the revision was a conscious, collective decision by the policy team, who wanted to "include the mental health patients and provide them with a greater opportunity to participate in their own treatment, . . . [and] be responsible and accountable as they do now on the outside to take their own medication if they were not ill such that they needed housing on the mental health unit." Dr. Clafton also confirmed that the intake staff have discretion to exclude persons from the KOP program. This was Carnill's understanding as well. Furthermore, the explicit exclusion for safety purposes in the 2012 KOP Policy adds an important safeguard. Thus, although the 2012 version of the KOP Policy is more inclusive than the 2009 version, it cannot be said that the revision was constitutionally irresponsible.

Thus, as the district court held, the County provided an adequate reason for changing the KOP policy.

## 3. Allowing Participation Before a Mental Health Evaluation

Andrews contends that the KOP Policy is deficient because it allows inmates in need of a psychological evaluation like White to participate prior to the psychiatrist's assessment of proper housing. Only a psychiatrist can place an inmate on the mental health unit.

But Carnill testified that he referred White for further mental health evaluation with a social worker because "she was on medication for depression and anxiety," not because she reported or exhibited any psychiatric distress. Carnill could have restricted access to all

medications under the KOP Policy but exercised his discretion not to.  Again, White did not have an automatic right to a suicide screening.  The absence of a blanket exclusion for "unsettled" inmates does not render the KOP Policy constitutionally defective.

### 4.  Failure to Act as a Backstop

Andrews maintains that the KOP Policy is constitutionally defective because it did not catch mistakes in the intake process.  He points out that had Carnill reviewed the intake form, he would have learned that White had attempted suicide in the past.  Furthermore, the answers recorded on White's intake form were incomplete or inconsistent.

This argument fails to persuade because it is essentially a repurposing of Andrews' arguments that the KOP Policy should require suicide risk assessments as a matter of course and should automatically exclude persons with any sort of mental health history.  What Andrews is really complaining about is the adequacy of the intake screening process.  This allegation is better characterized as a failure to train claim against the County, and to that extent will be addressed *infra*.

### 5.  Restricted Drug List

Andrews argues that the 2012 KOP policy ignored the serious medical needs of inmates because it restricted Catapres but not Verapamil.

Dr. Dlugokinski testified that Catapres was on the list because it was a hot commodity in the prison due to its sedative effects.  Both Dr. Dlugokinski and Dr. Clafton testified that Verapamil, while also a blood pressure medication, did not share the same side effect, so it was not considered subject to abuse by inmates.  Andrews did not offer any evidence to the contrary.  Thus, its absence from the restricted drug list cannot be characterized as a constitutional violation.

In sum, none of the foregoing factors, individually or collectively, create a genuine issue of fact regarding the constitutionality of the KOP policy and its application to White.  The district court did not err in granting summary judgment to the County on Andrews' official policy claim.

## B. Failure to Train

Andrews argues that the Jail's policy of failing to train its employees in suicide risk assessment shows deliberate indifference. "A municipality may be liable under § 1983 where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens." *Gray*, 399 F.3d at 618. To establish liability on this basis,

> the claimant must show not only that an employee's act caused a constitutional tort, but also that the city's failure to train its employees caused the employee's violation *and* that the city culpably declined to train "its employees to handle recurring situations presenting an obvious potential for such a violation."

*Arrington-Bey*, 858 F.3d at 995 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). "As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable." *Gray*, 399 F.3d at 618. And "[w]here such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide." *Id*.

As the district court recognized, Andrews cannot prevail on a failure-to-train theory of liability against the County because no constitutional tort was committed. No constitutional tort was committed here because White did not demonstrate a strong likelihood of committing suicide. Like the pretrial detainee who committed suicide in *Gray*, White "never made any statements that could reasonably be interpreted as threatening to harm [her]self." *Id*. at 619. During the intake process, White appeared mentally stable during two separate intake interviews and the Jail had no other information to suggest that she was threatening harm.[7] She expressly denied suicidal ideation or thoughts of harm when asked (twice). Even her former fiancé failed to flag the issue—because he did not think White was suicidal.[8] Furthermore, Carnill testified that had White presented as mentally unstable, he would have taken appropriate precautions, including housing her on the mental health unit and contacting the on-call psychiatrist. Thus,

---

[7]Contrary to Andrews' assertion, the Jail did not have White's other mental health records at intake.

[8]Andrews testified that the only time White expressed suicidal thoughts was when she admitted herself to Kingswood, where she "[f]ound out it was a particular medication that was pushing suicide thoughts." White also told Andrews that she had stopped taking the medication.

any purported lack of specific suicide risk assessment training did not cause White to commit suicide.  Finally, like the defendant city jail in *Gray*, the County has no history of suicides relative to the KOP program.  Thus, as in *Gray*, any purported failure to train its employees in suicide risk assessment did not cause White's death.

Other factors, such as White's use of depression and anxiety medication, did not change the calculus.  As Andrews' own expert, Dr. A. E. Daniel, M.D., admitted, "just because a person has depression, [that] doesn't mean [she is] suicidal," and "not all persons with depression or anxiety are suicidal."  Indeed, the fact that White had already taken steps to treat her anxiety and depression suggest that any potential suicidal tendencies were under control, and Carnill followed up by asking White if she had any suicidal thoughts or ideations, which she denied.  He also referred her to a social worker for evaluation.  In short, Carnill, a trained medical professional in the County's employ and entrusted by it to assess White's mental and physical condition, did not display deliberate indifference towards White.

Which brings us back to the only defendant in this case, Carnill's employer, the County. This court has "continuously held that under § 1983, a county can only be held liable if there is a showing of an underlying constitutional violation by the county's officials." *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020) (listing cases).  Axiomatically, "[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  For this reason, the district court properly held that the County was entitled to summary judgment on the failure to train claim.

## V. CONCLUSION

For these reasons, as well as those articulated in its detailed opinion, we **AFFIRM** the judgment of the district court.