RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

**20-3461**

M.J., a minor, by and through his guardian, S.J.; S.J.,

*Plaintiffs-Appellants,*

*v.*

AKRON CITY SCHOOL DISTRICT BOARD OF EDUCATION; AKRON CITY SCHOOL DISTRICT; DAVID W. JAMES, Superintendent of Akron City School District, in his official capacity; PHILOMENA VINCENTE, JENNIFER RAMON, and CHRISTOPHER HENDON, in their official and individual capacities,

*Defendants-Appellees.*

> Nos. 20-3461/3462

**20-3462**

M.H., legal custodian and next best friend of minor child, W.H.; W.H., by and through his guardian, M.H.,

*Plaintiffs-Appellants,*

*v.*

AKRON CITY SCHOOL DISTRICT BOARD OF EDUCATION; AKRON CITY SCHOOL DISTRICT; DAVID W. JAMES, Superintendent of Akron City School District, in his official capacity; PHILOMENA VINCENTE, TRACI MORRISON, and CHRISTOPHER HENDON, in their official and individual capacities,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court  for the Northern District of Ohio at Akron.
Nos. 5:18-cv-00577 (20-3461); 5:18-cv-00870 (20-3462)—Sara E. Lioi, District Judge.

Argued:  January 27, 2021

Decided and Filed:  June 15, 2021

Before: SUTTON, Chief Judge; BOGGS and NALBANDIAN, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** Edward L. Gilbert, EDWARD L. GILBERT CO., L.P.A., Akron, Ohio for all Appellants. Steven D. Strang, GALLAGHER SHARP LLP, Cleveland, Ohio, for all Appellees. **ON BRIEF:** Edward L. Gilbert, EDWARD L. GILBERT CO., L.P.A., Akron, Ohio for Appellants M.J., S.J., M.H., and W.H. Steven D. Strang, Richard C.O. Rezie, GALLAGHER SHARP LLP, Cleveland, Ohio, for all Appellees.

---

**OPINION**

---

NALBANDIAN, Circuit Judge. The Constitution does not guarantee a remedy for every wrong. That is unfortunately true in this strange case. Christopher Hendon impersonated a police officer to gain access to Leggett Elementary, a public school in Akron, Ohio. His plan was to restart the city's Scared Straight Program—a program in which unruly children and teens are exposed to arrest and imprisonment in hopes that the process will scare them into behaving well.[1] By dressing and acting like a legitimate police officer, Hendon convinced Leggett's administration and teachers that he worked for the Akron Police Department. This enabled him to roam the school's halls freely.

But Hendon heaped abuse on top of his fraud. He used his freedom to navigate Leggett to place children in handcuffs and force students to exercise. He even violently battered and verbally assaulted one child. Now, some of Hendon's victims are suing the Akron City School District, its Board of Education, and a few of Leggett's employees. They bring a variety of federal constitutional and statutory claims, as well as some state-law claims. The district court granted defendants summary judgment on the federal claims and dismissed the state-law claims without prejudice. Plaintiffs now appeal, and we **AFFIRM**.

---

[1]The original "Scared Straight!" documentary aired in the late 1970s and involved juvenile offenders exposed to inmates at Rahway State Prison in New Jersey. The film won an Academy Award for Best Documentary Feature in 1978 and spawned later documentaries, television shows, and copycat programs in other communities. *Scared Straight!*, Wikipedia, https://en.wikipedia.org/wiki/Scared_Straight! (last accessed Mar. 15, 2021).

I.

A.

The day Christopher Hendon first arrived at Leggett Elementary was chaotic. It began when a misbehaving child was sent to the front office. Leggett's principal, Philomena Vincente, called the child's mother to come pick him up. But instead of personally coming, the mother told the school that her "boyfriend who is a policeman" would come. That boyfriend turned out to be Christopher Hendon.

In the meantime, a mother of two of Leggett's students called to warn the school that the students' father, who was high on drugs, was coming to the school to try to kidnap the children. The mother feared that the father would kill himself in front of them. Naturally, the school called the police and summoned Akron Board of Education police officer Don Good, a reserve officer with the Akron Police Department. Though the father beat the police to the school, Vincente intervened in time to prevent him from taking his children, and when a marked police cruiser arrived, the father fled until police apprehended him.

While all this was going on, Christopher Hendon showed up. He was there to pick up the unruly child, who remained in the office as Vincente and the school tried to deal with the disruptive parent. After Hendon pulled up to the school, Vincente saw him speak with the Akron police officer who had arrived in response to the still-ongoing incident. Then, as he entered Leggett, he also talked briefly with Officer Good.

Hendon wore what looked like full SWAT garb—all black, with a vest and badge that said "officer," and his name on his uniform. Dressed this way, Hendon would not stand out on a normal day at Leggett. Uniformed police officers regularly roamed the school's halls at least a couple of times a month. They would interact with students and staff to show the students that "policemen are your friends." And when police showed up, it was usually unannounced—even the specific officer often varied. Staff identified a visitor as an officer simply by his or her uniform—although some said they did not expect officers to discipline students. Still, under an agreement between the Akron City School Board and the Akron Police Department, police officers could respond to "unruly behavior" and were "expected to assist school administrators in

situations where the officers' training and background experience may be useful." (R. 92-6, Agreement at 9–10, PageID # 2791–92).

When Hendon entered the office, the secretaries assumed he was a police officer and did not require him to sign in. They so assumed not only because of his clothing and interactions with police officers, but also because the boy Hendon was picking up had identified him as his mother's "policeman" boyfriend.

Hendon approached the boy and asked Vincente what kind of trouble he was in. He and Vincente then talked briefly about Hendon's efforts with the Akron City Council to restart the Scared Straight Program. Hendon and Vincente did not interact anymore that day, though Hendon hung around Leggett until the end of the day to speak with staff. He also spoke for the first time with one of our plaintiffs, M.J., who was a student at Leggett.

The next morning, Hendon showed up again, uninvited. And again, he was dressed in what looked like SWAT gear. He and Vincente spoke a second time about the Scared Straight Program. But this time, Vincente was explicit that she would not allow Hendon to run the program at Leggett or present the idea to parents. Still, Hendon was committed to his ruse—he showed Vincente a photo of himself posing with Akron's mayor.

Later that same day, M.J.'s teacher, Jennifer Ramon, called Leggett "administration" because M.J. had become aggressive in class. But instead of a school employee, Hendon showed up. He took M.J. out of the classroom and brought him to the office to ask Vincente for a room. Vincente directed them to a room near the office, where Hendon threw M.J. against a wall, table, and chairs and verbally abused him. After leaving the room, Hendon asked the office secretary for M.J.'s report card, and M.J. gave Hendon his mother's phone number. Then, Hendon returned M.J. to class—though M.J. did not tell Ramon or any other school employee about what happened.

Hendon was not finished with M.J. yet. After the first incident, M.J. and another student were misbehaving at recess. Observing this, a special education teacher retrieved Hendon, who took the two students inside to an empty cafeteria and brought them behind a curtain. He then

forced them to perform exercises and sent them back to class. Again, M.J. did not tell Ramon about what happened.

One last interaction between Hendon and M.J. bears mentioning. M.J. and a group of students began to act out in class. As she did earlier, Ramon called for administration. And also like the first incident, Hendon showed up instead. He took the boys from class but returned them a few minutes later. The boys apologized to their teacher, and class proceeded. It is unclear from the record what happened between the students and Hendon during their brief absence.

Hendon did not target only M.J. His time at Leggett also included an episode with W.H., another student at the school. W.H. was a student in Theresa Morrison's class when Hendon showed up at Leggett. Morrison first met Hendon in the front office, where Hendon introduced himself and told Morrison he was with the Scared Straight program. At the time, Hendon was dressed in his typical dark "uniform," which Morrison likened to that worn by other officers who visit Leggett. Because Morrison assumed Hendon was a police officer, she asked him if he worked for Akron and if he knew a friend of hers, who was also an Akron police officer. Hendon told Morrison that he indeed worked for Akron and that he knew her friend.

After this initial interaction, Morrison believed Hendon was a police officer. And Hendon reinforced her belief by showing her photos like those he showed Vincente. These included photos of Hendon with the mayor of Akron, a group of children at the Juvenile Detention Center, other police officers, and one of Hendon in uniform presenting to a group of children.

Some time later, W.H. got into a fight with another student during gym class. Morrison went to retrieve her class from gym, and when she arrived, the fight was still ongoing. After she separated the brawlers, Morrison brought W.H. to the office. There, Vincente told Morrison to call M.H., W.H.'s mother, to tell her to come pick W.H. up from school; Morrison obliged. While she was on the phone, Hendon approached her and asked to speak with M.H. Again, Morrison obliged because "[h]e was a police officer." She handed Hendon the phone, and he walked away to talk to M.H.

During the call, Hendon told M.H. that he was an officer with the Scared Straight program. And he explained to M.H. that W.H. was acting up in school. The two finished their call, and M.H. came to the school immediately. When she got there, she, Morrison, Hendon, and W.H. congregated in the hallway outside Morrison's classroom. Hendon told M.H. that he planned to handcuff W.H. and bring him to the office. M.H., assuming Hendon was a police officer, consented and even filmed the episode.

Once they got to the office, Hendon placed W.H. next to another boy. At the time, multiple other children were handcuffed there. Hendon left W.H. there for a few hours. When the day ended, Hendon removed W.H.'s handcuffs at M.H's request and asked M.H. if he could take W.H. home in his "cruiser car." M.H. again gave Hendon her permission, and Hendon drove W.H. home.

## B.

Eventually, the Akron police caught on to Hendon. They investigated and then arrested him, charging him with more than fifty crimes. And once his actions at Leggett became public, S.J. (M.J.'s mother) and M.H., on behalf of themselves and their sons (together, plaintiffs), sued. S.J. sued Vincente, Ramon, Hendon, the Akron City School District, the Akron City School District's Board of Education, and David James, superintendent of the Akron City School District. M.H. sued the same parties but substituted Morrison for Ramon. Each brought a slew of claims. They sued under § 1983, claiming deprivations of substantive due process and equal protection and asserting supervisory liability for failure to train. They also sued under the Rehabilitation Act, the ADA, and Title VI and brought some state law claims.

After discovery, defendants moved for summary judgment in both cases. The district court granted the motions in a single opinion. Now, plaintiffs appeal. Like the district court, we decide the cases in a single opinion. We affirm.

II.

Plaintiffs object to several of the district court's rulings.[2]  To start, they say the district court erred by ignoring on summary judgment transcripts of school officials' interviews with police.  The court ignored this evidence because it was hearsay and was unsworn. "Whether the proffered evidence is hearsay under the Federal Rules of Evidence is a question of law that we review de novo." *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).

Plaintiffs also say that the district court erred in dismissing their many substantive claims. We review the district court's grant of summary judgment on these claims de novo.  *Id.* at 272. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We draw reasonable inferences in favor of the nonmoving party.  *Carter*, 349 F.3d at 272. But once a party moves for summary judgment and identifies record materials showing no genuine dispute of material fact, the nonmoving party "must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  It must point to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A).

III.

We begin with the evidence the district court refused to consider: the police interview transcripts.[3]  The Akron police, while investigating Hendon, interviewed members of Leggett's staff and recorded these interviews.  Later, a notary public transcribed the interviews from the

---

[2]There were also several rulings plaintiffs do not challenge here.  For instance, they do not appeal the court's dismissal of their equal-protection and state-law claims or several of their bases for municipal liability.  They thus abandon those claims. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

[3]The district court also excluded an affidavit that M.H. (W.H.'s mother) filed to the extent that it contradicted her deposition testimony.  Plaintiffs spend a single sentence objecting to this ruling.  They say only that the district court "failed to consider evidence from M.H.'s affidavit that was consistent with her prior testimony." (20-3462 Appellant Br. at 27.)  Given this bare-bones briefing, plaintiffs forfeit their argument. *See, e.g.*, *Bard v. Brown County*, 970 F.3d 738, 750 (6th Cir. 2020).

audio file. And plaintiffs cited these transcripts in their response brief opposing defendants' motions for summary judgment. Then, in their reply to that brief, defendants "moved" to strike citations to those transcripts because they constituted unsworn hearsay.

Agreeing with defendants, the district court ignored the transcripts when deciding the summary judgment motion. It reasoned that the statements were unsworn and constituted inadmissible hearsay.[4] It did not err in ignoring the transcripts on the hearsay ground.

At the outset, defendants claim plaintiffs forfeited the argument that the transcripts are not hearsay by failing to raise it before the district court. But defendants themselves did not "move" to strike references to the transcripts until the final brief on the summary judgment motion. So plaintiffs, under defendants' theory, would have had to ask for leave to file a surreply just to preserve the issue. But a party need not "seek leave to file a sur-reply in order to preserve an argument for purposes of appeal." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 n.1 (7th Cir. 2008). Otherwise, "arguments before the district court would proceed ad infinitum making litigation unruly and cumbersome." *Id.* Plaintiffs therefore did not forfeit their argument that the court should consider the interview transcripts.

Of course, that does not mean plaintiffs win this issue on its merits. "[E]vidence submitted in opposition to a motion for summary judgment must be admissible." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). And hearsay—an out-of-court statement offered for its truth, Fed. R. Evid. 801(c)—is inadmissible unless the Federal Rules of Evidence or a federal statute provides otherwise. Fed. R. Evid. 802. Thus, at summary judgment, hearsay "must be disregarded." *U.S. Structures, Inc.*, 130 F.3d at 1189.

---

[4]The district court's (and defendants') focus on the fact that the interviewees' initial statements to police were unsworn appears to rely on an old line of cases holding that "a court may not consider unsworn statements when ruling on a motion for summary judgment." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir. 1991). But those cases arose from the old Rule 56—which required that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Fed. R. Civ. P. 56(e)(1) (old rule). In 2010, though, Rule 56 underwent revision. And "the amended rule specifically 'omit[s] as unnecessary' '[t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration.'" *Ganesh v. United States*, 658 F. App'x 217, 220 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment). So the fact that the interviewees' statements to police were themselves unsworn is not a basis under Rule 56 for ignoring them on summary judgment.

Heeding the call of Federal Rule of Evidence 802, plaintiffs point to the hearsay exemption in Rule 801(d)(2)(D) to try and get the police transcripts in. Rule 801(d) treats certain statements that might otherwise be hearsay as "not hearsay." And under 801(d)(2)(D), a statement is not hearsay if it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Plaintiffs say that the interview transcripts satisfy 801(d) because the interviewees—Philomena Vincente,[5] Patricia Derita, and Holly DeLisi—were defendants' employees.[6]

We have not spent much time discussing the contours of Rule 801(d)(2)(D) and its "scope" requirement. On its face, it requires that the statement be "made on a matter within the scope of" the employment relationship. Fed. R. Evid. 801(d)(2)(D). The "matter" the interviewees discussed was their observation of Christopher Hendon's criminal activity on Leggett's grounds. So the question is whether this was within the scope of the interviewees' employment.

We assume that it was. Akron City Schools' administrative guidelines state that when "the police conduct a criminal investigation in a school building," and they "want to question the staff," then "they should be permitted to do so." (R. 92-21, Akron City Schools Administrative Guidelines at 1, PageID # 3918.) School employees have no official *duty* to speak to police, but the school encourages them to do so. And it would be odd for the school to encourage its employees in an official policy statement to cooperate with police and then disclaim their words as outside of their employment when they do so.

In any event, the real problem is that plaintiffs have failed to show that they suffered any prejudice from the transcripts' exclusion. "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party." Fed. R. Evid. 103(a);

---

[5]Vincente is herself a defendant. But plaintiffs do not capitalize on Rule 801(d)(2)(A), which treats as not hearsay statements made by an opposing party in her individual or official capacity and offered against her. And the burden of showing that a statement fits an 801(d) exception is on the party introducing the statement. Wright & Miller, *Federal Practice & Procedure: Evidence* § 6776.

[6]One other individual whom police interviewed, Angel Schliskey, does not work at Leggett. She sometimes volunteers at the school. Though in some cases a volunteer might qualify as an "agent" under Rule 801(d), *see EEOC v. Watergate at Landmark Condo.*, 24 F.3d 635, 639–40 (4th Cir. 1994), nothing in this record suggests that she is an "agent or employee" of the District or Board of Education. *See* Fed. R. Evid. 801(d)(2)(D).

*see also Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 900 (6th Cir. 2004).  But plaintiffs deposed most of the same witnesses (including the named individual defendants) whose police interviews they now try to cite.  And plaintiffs have been unable to articulate what exactly sets the transcripts apart from the depositions they took.  So it is unclear what the transcripts can add to our resolution of this case that the record does not already contain.  *See Tompkin*, 362 F.3d at 900 ("Assuming that this testimony was relevant . . . and also assuming that the testimony was not inadmissible hearsay, Tompkin has not shown that she was prejudiced by the exclusion of this testimony." (footnotes omitted)); *see also In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996) (noting that there is no prejudice from the exclusion of evidence if substantially similar evidence was admitted or if the excluded evidence would not have affected the outcome).

Thus, we affirm the district court's exclusion of these interview transcripts in deciding the summary judgment motion.

IV.

A.

We turn next to plaintiffs' substantive claims, starting with due process.**7**  Section 1983 provides a statutory cause of action for the deprivation of federal rights, privileges, or immunities by those acting under color of state law.  42 U.S.C. § 1983.  Plaintiffs claim through § 1983 that defendants deprived them of due process by creating the danger to which they were exposed—an impostor police officer with access to their school, which he used to, among other things, batter and falsely imprison them.

---

**7**Plaintiffs say defendants never moved for summary judgment on a host of their claims, and so those claims must go to trial.  This argument fails for four reasons.  First, in both cases, defendants incorporated related summary judgment motions, listed all of plaintiffs' counts and argued individually why they all failed, then asked the court to "dismiss the claims against them with prejudice."  So defendants asked the district court for summary judgment on all claims and for all defendants, whether in their individual or official capacities.  *See Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 798–99 (5th Cir. 2010).  Second, the district court dismissed "[a]ll federal claims" with prejudice in both the M.J. and M.H. cases.  (R. 127, Mem. Op. & Order at 49, PageID # 5560.)  Third, plaintiffs responded to the motions for summary judgment and discussed the causes of action they say defendants did not address in their motions.  *See C.G. v. Gann*, 231 F. App'x 851, 853 n.1 (11th Cir. 2007).  And finally, plaintiffs in those responses failed to argue that defendants did not move for summary judgment as to all their claims.  *See, e.g.*, *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014) ("Generally, we will not address arguments raised for the first time on appeal.").

Plaintiffs rely on the substantive component of the Fourteenth Amendment. That amendment provides that no state can deprive a person of life, liberty, or property without due process. U.S. Const. amend. XIV, § 1. "But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). So the clause does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* And, in general, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

At the same time, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. One such instance is when the state renders a person "more vulnerable to" the dangers that befell him. *Id.* at 201. Thus, we have held that "when the State 'cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts,' it has established a 'special danger' and a duty to protect its citizens from that risk." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (alterations in original) (quoting *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir. 1998)).

This is known as the state-created danger doctrine. And it imposes a demanding standard. To succeed with it, plaintiffs must show three things. First, they must show "an affirmative act by the state which either created or increased the risk that [they] would be exposed to an act of violence by a third party." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Next, they must establish "a special danger to [them] wherein the state's actions placed [them] specifically at risk, as distinguished from a risk that affects the public at large." *Id.* And finally, they must show that the state was aware of the "substantial risk of serious harm" and responded in a way that was "conscience shocking." *Doe v. Jackson Local Sch. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020).

Both sets of plaintiffs bring § 1983 claims against Vincente. W.H. also makes a § 1983 claim against Morrison, and M.J. against Ramon. They allege that Vincente gave Hendon access to Leggett, which allowed him to perpetrate his crimes, that she allowed Hendon to use school

facilities to deal with children, and that she witnessed Hendon abuse children and place them in handcuffs. M.J. alleges that Ramon called for assistance, and when Hendon showed up, she allowed him to take M.J. out of class. Finally, W.H. alleges that Morrison let Hendon interact with W.H.'s mother and allowed Hendon to handcuff W.H. But because none of these allegations suffices to make out a state-created danger, we affirm the grant of summary judgment on these claims.

1.

We can dispense in short order with the claim against Ramon. The most that can be said about her is that she did not prevent Hendon from taking M.J. from her class. But a "failure to act is not an affirmative act under the state-created danger theory." *Id.* So even if Ramon "stood by and did nothing when suspicious circumstances dictated a more active role for" her, this is not enough. *DeShaney*, 489 U.S. at 203; *see also Chigano v. City of Knoxville*, 529 F. App'x 753, 757 (6th Cir. 2013) ("Generally . . . the failure to protect a person from violence at the hands of a third party is not a constitutional violation."). M.J.'s claim against Ramon thus fails at the first step of the state-created danger doctrine.

2.

The claim against Morrison also fails. Recall that Morrison called M.H. after W.H. got into a fight with one of his classmates. And while they were speaking, Hendon interjected and insisted that Morrison allow him to speak to M.H., a request Morrison granted. That is the extent of Morrison's involvement here.

Whether this phone exchange is an "affirmative act" within our state-created danger jurisprudence is a close question. Normally, to answer such a question, we ask "whether [the victim] was safer *before* the state action than he was *after* it." *Cartwright,* 336 F.3d at 493. But we need not resolve this close call. We can reasonably infer, as we must at this stage of the litigation, that W.H. was safer before Morrison handed Hendon the phone because Hendon may have used the opportunity to convince M.H. that he was a police officer with authority to handcuff her son.

But M.H.'s substantive due process claim still fails. "[I]n addition to showing the requisite state action, [plaintiffs] must show the requisite state culpability necessary for a Due Process Clause action." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003). This is the third prong of the state-created danger doctrine. It requires a showing of at least deliberate indifference. And "[t]he government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006) (quotations omitted). This is a high bar—one that surpasses mere negligence. *Doe*, 954 F.3d at 932. "[O]nly extreme misconduct"—conduct that shocks the conscience—"will violate the [Due Process] clause." *Id.* at 933.

The requisite level of culpability depends on the nature of the government's act. The "deliberate-indifference standard is appropriate in 'settings [that] provide the opportunity for reflection and unhurried judgments,' but . . . a higher bar may be necessary when opportunities for reasoned deliberation are not present." *McQueen*, 433 F.3d at 469 (first alteration in original) (quoting *Bukowski,* 326 F.3d at 710). Thus, "an actual intent to injure is required when public actors must make hasty decisions." *Doe*, 954 F.3d at 933; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 852–53 (1998). But when the official has time for reflection, deliberate indifference requires that he "must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Doe*, 954 F.3d at 933 (quotations omitted). Once the official learns of facts allowing him to infer a risk of harm, "the official next must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights." *Id.* (quotations omitted).

But there is no evidence here that Morrison was deliberately indifferent when she handed Hendon the phone. She—along with other school officials and parents—thought Hendon was a legitimate police officer. And she did not listen to Hendon's conversation with M.H. or otherwise see Hendon place other children in handcuffs. In fact, up to the time Hendon took the phone from Morrison, her interactions with him were all positive. He passed Morrison's class in the halls and encouraged her students to behave well and get good grades. So the record discloses no facts that would have allowed Morrison to infer that a substantial risk of serious harm to W.H. existed—let alone that Morrison drew that inference. *Doe*, 954 F.3d at 933.

Besides, when Hendon approached Morrison and asked her for the phone, Morrison did not have time for reflection and unhurried judgment, so a stricter level of culpability applies. *Id.*; *McQueen*, 433 F.3d at 469. And nothing here suggests Morrison acted with an intent to injure W.H. when she let Hendon speak to M.H. *Doe*, 954 F.3d at 933. So W.H.'s substantive due process claim against Morrison fails.

3.

That just leaves Vincente. Both sets of plaintiffs sue her. But W.H. alleges only that Vincente did not stop Hendon from walking around Leggett and interacting with students. This type of inaction fails to meet the first requirement in the state-created danger doctrine. *Cartwright*, 336 F.3d at 493; *see also DeShaney*, 489 U.S. at 203. Thus, for W.H.'s claim against Vincente, we affirm the district court's grant of summary judgment.

M.J.'s claim against Vincente is a bit more complicated. By way of reminder, Vincente directed Hendon to a room so that he could discipline M.J. This qualifies as an affirmative act under the state-created danger doctrine. *Cartwright,* 336 F.3d at 493. And in that room, Hendon allegedly battered M.J. and called him derogatory names.

Noting this, the district court refused to grant summary judgment on the merits of the claim. The court reasoned that Vincente knew Hendon wanted to restart the Scared Straight program, knew handcuffing children constituted corporal punishment, and knew Hendon had been handcuffing children. And it is disputed when Vincente learned all these facts in relation to her decision to allow Hendon a private room to discipline M.J. Thus, the court refused to grant Vincente summary judgment on the merits of M.J.'s due process claim. It did, however, grant her summary judgment in the end because it found she was entitled to qualified immunity.

But in denying Vincente summary judgment on the merits of the Fourteenth Amendment claim, the district court misconstrued the "demanding" culpability standard our precedent lays out. *Doe*, 954 F.3d at 933. Indeed, "[t]o be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, a public official must know of more than a *general* risk of harm." *Id.* at 933–34 (quotations and citation omitted). Instead, "[t]he official must know of the *specific* risk that later develops." *Id.* at 934; *see McQueen*, 433 F.3d at 469.

So even if a jury could fault an official's response to certain facts, there is no constitutional violation if the official was unaware of facts from which she could infer a risk of harm *of the type that actually happened*. *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014).

But here, the facts the district court laid out as allowing Vincente to infer a risk of harm do not translate into the actual harm that befell M.J. The court pointed to Vincente's knowledge that Hendon was handcuffing students—a prohibited practice. But this is not the harm that befell M.J. as a result of Vincente's affirmative act. Instead, Hendon threw M.J. against a wall, tables, and chairs and used racial epithets against him. And "nothing about the 'kind and degree of risk'" arising from Hendon handcuffing students suggested that he "also posed a risk of" violently throwing students around a room. *Doe*, 954 F.3d at 935 (quoting *Range*, 763 F.3d at 591). Indeed, Vincente "had no knowledge of [Hendon] ever attacking students." *Id.*[8]

And it is not enough that handcuffing students and throwing them around rooms both constitute battery. Consider *McQueen*. There, a student had a history of violently attacking students with a pencil. 433 F.3d at 462. But his teacher's knowledge of this history did not translate into knowledge that the same student might later bring a gun to school and shoot another student. *Id.* at 469–70. And if knowledge of violent battery with a pencil cannot establish subjective awareness of a risk of battery with a gun, neither can knowledge of handcuffing students establish subjective awareness of a risk of violent battery and verbal abuse. *Id.*; *see Doe*, 954 F.3d at 935.

The actual harm that M.J. experienced because of Vincente's affirmative act is not the type that Vincente could have inferred from known facts. Because we may affirm on any ground supported by the record, we affirm the district court's grant of summary judgment. *See, e.g.*, *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 886 (6th Cir. 2020).

B.

Plaintiffs also sue the Akron City School District and its Board of Education. They say these defendants are liable under § 1983 for failing to train their employees in spotting dangers to

---

[8]Here again, we note that plaintiffs have failed to identify whether there are any statements that Vincente made during her interview by the Akron police that would affect this analysis.

students. The district court disagreed, and so do we. A municipality "can only be held liable if there is a showing of an underlying constitutional violation by" its officials. *Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020) (quoting *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020)). In other words, "[t]here can be no . . . municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). And here, none of the school employees is liable under plaintiffs' substantive due process theory. So the district court correctly granted summary judgment for defendants on this claim.

C.

Plaintiffs also claim that the school and its employees[9] violated the Rehabilitation Act and the ADA. They note that both W.H. and M.J. are disabled, and they argue that school officials targeted the students because of these disabilities. "Given the similarities in the two statutory provisions, we long have merged our analyses under the ADA and Rehabilitation Act." *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 836 (6th Cir. 2020).

Both the ADA and the Rehabilitation Act combat discrimination against disabled individuals. *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And the Rehabilitation Act provides that a qualified individual with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Both Acts allow disabled individuals to sue school districts that discriminate against them because of their disability. *Gohl*, 836 F.3d at 681.

Plaintiffs can defeat summary judgment here through either a direct or indirect showing of discrimination. *Id.* at 682. "Direct evidence explains itself." *Martinez v. Cracker Barrel Old*

---

[9]Neither the ADA nor the Rehabilitation Act supports a claim against a public official acting in his or her individual capacity. *See, e.g.*, *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009); *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004). So plaintiffs can only lodge these claims against the school officials in their official capacities and the District and Board of Education.

*Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). It does not require the factfinder to make any inferences before concluding that unlawful discrimination happened. *Id.* But plaintiffs' evidence of discrimination here requires the inferential leap that the teachers sought Hendon's assistance *because of* their students' disabilities, and that the students acted out *because of* their disabilities. This is not direct evidence; there is "no smoking gun." *Gohl*, 836 F.3d at 683. Plaintiffs' chain of reasoning requires us to infer that the students' disabilities caused both their misbehavior *and* the teachers' responses to it. So plaintiffs cannot succeed on a direct showing.

Nor can they succeed on an indirect showing. To move forward on an indirect showing, plaintiffs "must meet the requirements of the familiar *McDonnell Douglas* test," which we apply to both statutes. *Id.* at 682. This requires plaintiffs to make out a prima facie case of discrimination. *Id.* They must show that (1) they are disabled; (2) they are "otherwise qualified" to participate in the public program; (3) they were subject to discrimination because of their disabilities; and (4) the program receives federal funding (for the Rehabilitation Act only). *Id.*

Plaintiffs say, and defendants do not contest, that M.J. and W.H. are disabled. The only point of contention is causation. And to establish the causation that both Acts require, "the plaintiff must establish a but-for relationship between the protested act and the individual's disability." *Id.* So under the ADA, plaintiffs must present "sufficiently 'significant' evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior." *Id.* (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)). And showing causation under the Rehabilitation Act is even harder. Plaintiffs must show that the school and its employees discriminated against them "solely by reason of" their disability. 29 U.S.C. § 794(a). At any rate, under each Act, plaintiffs must present evidence of how the school treated comparable, non-disabled students. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992); *see also Gohl*, 836 F.3d at 683.

But plaintiffs here fail to point to any comparators.[10] They note that Hendon handcuffed a few other students to bring them home or reprimand them. And they say Hendon forced one of

---

[10]This is especially difficult to do against Theresa Morrison. As we have pointed out, *McDonnell Douglas* is of "little help in the context of a claim involving a teacher who works only with individuals in a protected group." *Gohl*, 836 F.3d at 683. And Morrison works only with students with learning disabilities.

M.J.'s classmates to exercise alongside him.  But they say nothing about whether these students were also disabled.  And they introduced no evidence detailing which students the school mistreated and which they did not.  So "there is no evidence in the record about how *any* 'comparable non-protected' people were treated."  *Gohl*, 836 F.3d at 683.  And "[i]n the absence of evidence of a well-treated comparator, [plaintiffs] cannot prove that discrimination against the disabled was the reason for" their mistreatment.  *Id.*

Without comparators, plaintiffs cannot make an indirect showing of discrimination.  And because plaintiffs have not offered direct evidence of discrimination, their ADA and Rehabilitation Act claims fail.

D.

Plaintiffs present one last cause of action: Title VI.  They say that because Hendon targeted only African American children, a jury could infer that the students' race motivated the harassment.  But the district court rejected this theory, noting there was no evidence of race discrimination by defendants.  We agree.[11]

Title VI prohibits any "program or activity receiving Federal financial assistance" from discriminating against any person "on the ground of race, color, or national origin."  42 U.S.C. § 2000d.  And it provides a private cause of action for injunctive relief and damages.  *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).  But it proscribes only *intentional* discrimination.  *Id.* at 280.

And for that reason, plaintiffs' Title VI claim fails.  They have not identified a single piece of record evidence suggesting intentional discrimination.  At most, they claim Hendon targeted only African American children, and the school could not identify any white children whom Hendon targeted.  But even that is not an allegation of intentional discrimination *by school officials*.  And plaintiffs' contention that school officials knew about Hendon's harassment of

---

[11]"[T]here is no vicarious liability under Title VI."  *Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014).  And plaintiffs have not established that the District, the Board of Education, or Superintendent James "participated in, [were] aware of, or [were] deliberately indifferent to any discriminatory acts."  *Id.*  So the Title VI claim against them fails.

several students does not suffice, either. They must allege intentional discriminatory acts by a public official and support that allegation with evidence. *See id.* at 280. They do not.

V.

The events that triggered this lawsuit are undoubtedly upsetting. And perhaps plaintiffs can look to state law to find some relief. But, for the reasons given, they cannot succeed on their federal claims. We **AFFIRM** the district court's grant of summary judgment.